## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Rock US Holdings Inc., et al.,[1] | ) | Case No. 10-12892 (PJW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered Requested) |
|  | ) |  |

### DECLARATION OF MICHAEL L. BRODY IN SUPPORT
### OF CHAPTER 11 PETITIONS AND FIRST DAY ORDERS

I, MICHAEL L. BRODY, make this declaration ("Declaration") pursuant to 28 U.S.C. § 1746 and, to the best of my knowledge and after reasonable inquiry, state:

1.     Briefly, I am the President and Chief Operating Officer of Loeb Partners Realty, a privately held real estate company that makes opportunistic investments in real estate properties, with its major focus on the creation and enhancement of the value of these properties through repositioning, renovation and intensive asset management.   I have over twenty-five years of commercial real estate experience, most recently serving as Managing Director and Head of CMBS Origination for Merrill Lynch.   In addition to my capital markets experience at Merrill Lynch, I was a Senior Vice President of GMAC Commercial Mortgage and was a Managing Director of Nomura Securities in New York and San Francisco. I began my career as a leasing broker at Cushman & Wakefield and was Vice President of Asset Management for the Mack Company (predecessor entity of the Mack-Cali REIT).   I received a B.A. degree from the College of Arts & Sciences at Cornell University and a M.B.A. in finance from Columbia University.

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: (i) Rock US Holdings Inc. (4051); (ii) Rock US Investments LLC (5255); (iii) Rock New York (100-104 Fifth Avenue) LLC (9477); and (iv) Rock New York (183 Madison Avenue) LLC (4817). The address for each Debtor is: 183 Madison Avenue, Suite 617, New York, NY 10016.

2.    Currently, I am, among other things, a Director and/or Senior Vice President of Rock US Holdings Inc. ("RUSH"), Rock US Investments LLC ("Rock Investments"), Rock New York (100-104 Fifth Avenue) LLC ("Rock Fifth Avenue") and Rock New York (183 Madison Avenue) LLC ("Rock Madison Avenue"), the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors"), each of which commenced voluntarily cases (the "Chapter 11 Cases") under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 - 1532 (the "Bankruptcy Code") in this Court on September 15, 2010 (the "Petition Date").[2] I have served as Director and/or Senior Vice President of each of the Debtors since July 2009.  I am generally familiar with the operations, financial affairs and books and records of the Debtors.

3.    I submit this Declaration concurrently with each of the Debtors' Chapter 11 petitions to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of the Chapter 11 Cases.  Also, this Declaration is submitted  in support of the petitions and various first day motions and applications of the Debtors (the "First Day Motions"), filed contemporaneously herewith, or as soon as reasonably practicable hereafter, and by which the Debtors seek relief necessary to enable the Debtors and their affiliates to operate effectively, minimize certain of the potential adverse effects of the commencement of the Chapter 11 Cases, preserve and maximize the value  of the Debtors' assets during the pendency of the Chapter 11 Cases in anticipation of disposing of such assets pursuant to the *Joint Prepackaged Plan of Reorganization of Rock US Holdings Inc., Rock US Investments LLC, Rock New York (100-104 Fifth Avenue) LLC, and Rock New York (183 Madison Avenue) LLC under Chapter 11 of the Bankruptcy Code* (the "Plan"), streamline the administration of the Chapter 11 Cases, and facilitate the implementation of the settlements and agreements underlying the Plan.

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan (defined below) which was submitted in these Cases on the Petition Date.

4. This Declaration is divided into two parts: Part I describes the Debtors' businesses, capital structure and the circumstances that lead to the filing of the Chapter 11 Cases; Part II sets forth relevant facts in support of each of the First Day Motions.

5. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by others, upon my review of relevant documents, or upon my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

## PART I

### A. Background

6. The Debtors are direct or indirect subsidiaries of Rock Joint Ventures Ltd ("RJV"), an English registered company which is in administration proceedings in the United Kingdom. RJV is part of a group of more than 45 companies,[3] the majority of which are incorporated in England and Wales (but including the Debtors and certain other non-property owning US entities), which prior to May, 2009 were managed day to day by Paul Kemsley. RJV owns a portfolio of real properties located primarily in England, but through the vehicle of the Debtors, also owns or has a condominium interest in two pre-war commercial office buildings located at 100-104 Fifth Avenue, New York, New York (the "Fifth Avenue Property") and 183 Madison Avenue, New York, New York (the "Madison Avenue Property", and together with the Fifth Avenue Property, the "Properties").

---

[3] The group includes, among other companies, (i) RJV, (ii) Rock Investment Holdings Limited ("RIH"), a wholly-owned subsidiary of RJV, (iii) the Debtors, which are direct or indirect subsidiaries of RJV, (iv) Rock Op Limited, (v) Selhurst Park Limited, (vi) Insigniacorp Limited, (vii) Goodview Limited, and (ix) Birchridge Ltd (collectively, the "Rock Group Companies").

7.     Bank of Scotland plc (the "Bank") financed RJV with loans in excess of approximately £84 million and $250 million in the aggregate and not less than $259,504,286 million of which was used by the Debtors for the acquisition of the Properties.  In connection with such loans, Rock Fifth Avenue and Rock Madison Avenue granted mortgages and other liens and security interests in favor of the Bank in its capacity as Senior Agent, Senior Lender, Subordinated Agent and Subordinated Lender.  A full description of the Debtors' debt obligations is set forth below.

8.     In March, 2009, the Bank notified RJV and the Debtors of certain defaults on their loan obligations to the Bank.  No payments of principal or interest have been made in respect of any of the loan obligations to the Bank since that time by RJV or the Debtors.  As a result of the defaults and the subsequent failure to agree to a consensual solution not involving an insolvency process, Paul Kemsley entered into an agreement with the Bank whereby he resigned his management positions in the Debtors and resigned as director of the various other Rock Group Companies.  In addition, Paul Kemsley consented to the appointment on May 28, 2009, of Bruce Cartwright (partner), Laurie Manson (director), and Peter Spratt (partner) of PricewaterhouseCoopers LLP (solely in their capacities as such, the "Administrators"), as the joint administrators in the United Kingdom (the "UK") of certain of the Rock Group Companies, including RJV.   As discussed below, the Administrators are conducting administration proceedings in the UK with respect to RJV and certain of the other Rock Group Companies (collectively, the "Administration Proceedings").[4]

---

[4] All information pertaining to the Debtors and the other entities described herein, to the extent it relates prior to the Administration Proceedings and the employment of the Administrators, is based on information and belief derived from the existing records and personnel of the Debtors and is not verifiable in all respects.

9.     The Administrators (solely in their professional capacities and not in their individual, personal capacities) may do anything necessary or expedient for the management of the affairs, business and property of RJV, and a company in administration, or an officer of a company in administration, may not exercise management power without the consent of its administrators.   The Administrators, therefore, in effect, control RJV, which is the ultimate parent company and sole equityholder of each of the Debtors. The Administrators conducted an investigation of the values of the Properties and the management of the Debtors and determined to replace the prior management of the Debtors with Sharon Manewitz[5] and me.  Ms. Manewitz and I serve as directors and/or officers (the "Officers") of each of the Debtors.

10.     Prior to the Petition Date, the Administrators and the Officers spent considerable time and effort stabilizing the operations of the Debtors and the Properties.  As evidenced by various appraisals obtained by the Debtors, prior to the Administration Proceedings, the values of the Properties dropped precipitously from their 2007/2008 acquisition values as a result of a combination of the deleterious effect of the financial crisis on New York City property values and the poor condition of the Properties resulting from RJV's inadequate management of the Properties.  However, the condition of the Properties was enhanced by the Administrators and Officers stabilization efforts and the hiring of a new, professional asset manager, FirstService Williams LLC, now known as Colliers International ("Colliers").  Subsequently, we began to see evidence of improvement in the New York City commercial real estate market.

---

[5] Sharon Manewitz is a restructuring professional with over twenty-five years of experience in finance and workouts of under-performing investments. She has broad expertise managing distressed investments involving real estate and corporate entities - public and private, domestic and international, and an understanding of insurance and banking regulatory environments. Her corporate governance experience uniquely qualifies her to sit on boards of troubled companies and companies that have emerged from Chapter 11 proceedings.

11.     As the New York City real estate market showed signs of recovery and renewed interest in the acquisition of properties such as ours, the Debtors, in consultation with the Administrators and the Bank, examined hold versus sell options.  It was determined that, given the need to infuse additional capital to cover costs, maintenance, and improvements, and enhance the attractiveness of the Properties to tenants, which the Bank was unwilling to fund to completion, a sale of the Properties should proceed in order to realize the improving value of the Properties.

12.     While continuing efforts to stabilize the operations of the Debtors and the Properties, the Administrators and Officers considered, in consultation with the Bank, the appropriate format and timing for disposition of the Properties.  We reviewed liens, litigation claims, and other encumbrances on the Properties, and, as more fully described below, concluded that effectuating a sale of the Properties through a pre-packaged bankruptcy process under section 1129 of the Bankruptcy Code would provide the greatest comfort to buyers concerned about the overhang of the Administration Proceedings and the Debtors' insolvency, and the most efficient and expeditious method of resolving disputes over certain pre-petition contracts and governmental actions described more fully below, thereby allowing the Debtors to maximize recoveries for creditors of the estates.  We believe this process has enhanced the prices buyers are willing to pay for the Properties, through the prospect of a sale, free and clear of liens, encumbrances and burdensome contracts and free of transfer and other stamp taxes.  The Bank reserves the right to take title to the Properties itself or designate other entities as purchasers if, for some reason, the Madison Avenue Purchase Agreement and/or the Fifth Avenue Purchase Agreement have terminated prior to their respective closing dates.

13.     The Debtors commenced a major international marketing of the Properties prior to the Petition Date through their broker, Studley, Inc. ("Studley"), a premier New York City brokerage firm. The marketing was followed by multiple rounds of bidding and a coordinated process for identifying the highest and best bids for the Properties. The Debtors, in consultation with the Administrators and the Bank, have selected 100-104 Fifth, LLC as the purchaser of the Fifth Avenue Property (the "Fifth Avenue Purchaser") and Rigby 183 LLC as the purchaser of the Madison Avenue Property (the "Madison Avenue Purchaser", and together with the Fifth Avenue Purchaser, the "Purchasers"), to be presented to the Court for approval.

14.     On the Petition Date, the Debtors intend to file the Plan, which contemplates the sale of the Properties to the Purchasers pursuant to their signed agreements following confirmation of the Plan. These sales will fully liquidate the assets of the estates, with the proceeds to be applied to payment of administrative, priority and secured claims, including a partial payment of the Bank's senior secured claims. Virtually all unsecured claims, which consist almost entirely of ordinary course obligations arising from the ongoing management of the Properties, apart from the Bank's substantial deficiency claims, potential disputed litigation claims, and rejection damages claims, will be paid in connection with the assumption by the Debtors of the executory contracts and unexpired leases underlying such claims and assignment of the same to the Purchasers and will be funded by the Bank's cash collateral, prior to or after the Petition Date.

B.     **The Debtors' Business**

(i)     **The Debtors**

15.     The Debtors are Delaware corporations or limited liability companies formed solely for the purpose of owning and operating the Properties. RJV is the sole member of Rock Madison Avenue. RJV is the sole stockholder of RUSH, which is believed to be the sole member

of Rock Investments, which in turn is the sole member and manager of Rock Fifth Avenue. The Administrators act as the controlling shareholders or member of the Debtors and their affiliates through their control of RJV.[6]

### (ii) Assets

#### a. 183 Madison Avenue

16.     As indicated above, Rock Madison Avenue owns the Madison Avenue Property. The Madison Avenue Property is a pre-war office building on the corner of Madison Avenue and 34th Street in Manhattan, which contains approximately 246,417 square feet of net rentable area based on a 27% loss factor for single tenant floors and 35% loss factor for multi-tenant floors. The Madison Avenue Property was 72.3% leased as of September 1, 2010.

#### b. 100-104 Fifth Avenue

17.     Rock Fifth Avenue owns the Fifth Avenue Property. The Fifth Avenue Property is a pre-war office condominium in two connected buildings on the west side of Fifth Avenue between 15th and 16th Streets. The ground floor retail condominium is separately owned by the OFA Partners, LLC ("OFA"), who, together with others, is a prior owner of the Fifth Avenue Property. The office portion of the Fifth Avenue Property, which is owned by Rock Fifth Avenue, begins on the second story and continues to the 19th story (however, there is no floor designated as the 13th story). The Fifth Avenue Property has separate entrances at 100 Fifth Avenue and 104 Fifth Avenue. The floors align evenly, and floors 8, 9, 12 and 16 are inter-

---

[6] In addition to being the Administrators of RJV, on May 28, 2009, the Administrators were appointed to the other Rock Group Companies. Birchridge Ltd is the sole shareholder of Rock US Property Management Holdings, Inc. ("RUSPM Inc."), a Delaware corporation, which in turn holds 50% of the membership interests in Rock US Property Management LLC ("RUSPM LLC"), a Delaware limited liability company that managed the Properties at one time but which currently has no business activities. The other 50% interest in RUSPM LLC is, on information and belief, owned by Scott Pudalov and Alan Wildes, two individuals formerly employed by RUSPM LLC. The Officers have also been appointed as officers of RUSPM LLC.

connected. The overall office condominium contains approximately 266,828 square feet of net rentable area, which was 77.2% leased as of September 1, 2010.

### C. Prepetition Indebtedness Related to the Properties

#### (i) Mortgage Debt

18. The Debtors, under prior management, financed their acquisitions of the Properties and the construction of certain improvements with the proceeds of the following loans made by the Bank:

#### (a) Madison Avenue Property

19. Pursuant to the terms of a Senior Facilities Agreement, dated as of December 11, 2006 (as amended and restated, the "Senior Facilities Agreement"), among the Bank, as arranger, facility agent, security agent and issuing lender (the "Senior Agent") and the lenders party thereto from time to time (the "Senior Lenders"), RJV, the Debtors and certain other parties, the Senior Lenders provided a loan in the original aggregate principal amount of not less than $97,385,966 in April 2007 (the "Senior Madison Avenue Loan"). The Senior Madison Avenue Loan was made to RJV, as borrower, and the proceeds thereof were used by Rock Madison Avenue to finance a portion of the purchase price of the Madison Avenue Property.[7] Rock Madison Avenue guaranteed certain obligations of RJV (and certain of its subsidiaries) under the Senior Facilities Agreement (including the Senior Madison Avenue Loan) (the "Senior Madison Avenue Guaranty"). As collateral security for the Senior Madison Avenue Guaranty and the Senior Madison Avenue Loan, Rock Madison Avenue granted to the Security Agent for the benefit of the Senior Lenders a mortgage on the Madison Avenue Property in the amount of $96,081,000,

---

[7] Simultaneously with the borrowing of the Senior Madison Avenue Loan, RJV made a loan to Rock Madison Avenue with the proceeds of the Senior Madison Avenue Loan in an original principal amount equal to the original principal amount of the Senior Madison Avenue Loan (the "Senior Madison Avenue Intercompany Loan").

which was recorded in the Office of the City Register of the City of New York, and a security interest in all of its personal property. All of the equity interests of Rock Madison Avenue were also pledged to the Security Agent for the benefit of the Senior Lenders in connection with the Senior Madison Avenue Loan.

20.   In addition, pursuant to the terms of a Subordinated Facilities Agreement, dated as of December 11, 2006 (as amended and restated, the "Subordinated Facilities Agreement"), among the Bank, as arranger, facility agent, security agent and issuing lender (the "Subordinated Agent") and the lenders party thereto from time to time (the "Subordinated Lenders"), RJV, the Debtors and certain other parties, the Subordinated Lenders provided a loan in the original aggregate principal amount of not less than $10,098,561 in April 2007 (the "Subordinated Madison Avenue Loan"). The Subordinated Madison Avenue Loan was made to RJV, as borrower, and the proceeds thereof were used by Rock Madison Avenue to finance a portion of the purchase price of the Madison Avenue Property.[8] Rock Madison Avenue guaranteed certain obligations of RJV (and certain of its subsidiaries) under the Subordinated Facilities Agreement (including the Subordinated Madison Avenue Loan) (the "Subordinated Madison Avenue Guaranty"). As collateral security for the Subordinated Madison Avenue Guaranty and the Subordinated Madison Avenue Loan, Rock Madison Avenue granted to the Security Agent for the benefit of the Subordinated Lenders a mortgage on the Madison Avenue Property in the amount of $9,608,000, which was recorded in the Office of the City Register of the City of New York, and a security interest in all of its personal property. All of the equity interests of Rock

---

[8] Simultaneously with the borrowing of the Subordinated Madison Avenue Loan, RJV made a loan to Rock Madison Avenue with the proceeds of the Subordinated Madison Avenue Loan in an original principal amount equal to the original principal amount of the Subordinated Madison Avenue Loan (the "Subordinated Madison Avenue Intercompany Loan"). The payment of principal and interest on the Subordinated Madison Avenue Intercompany Loan is subordinated to the payment of principal and interest on the Senior Madison Avenue Intercompany Loan.

Madison Avenue were also pledged to the Security Agent for the benefit of the Subordinated Lenders in connection with the Subordinated Madison Avenue Loan.

(b) <u>Fifth Avenue Property</u>

21. Pursuant to the terms of the Senior Facilities Agreement, the Senior Lenders also provided a loan to Rock Fifth Avenue, as borrower, in the original aggregate principal amount of not less than $128,186,872 in February 2008, the proceeds of which were used by Rock Fifth Avenue to finance a portion of the purchase price for the Fifth Avenue Property (the "<u>Senior Fifth Avenue Loan</u>"). RUSH, Rock Investments and Rock Fifth Avenue guaranteed certain obligations of RJV and certain of its subsidiaries under the Senior Facilities Agreement. As collateral security for the Senior Fifth Avenue Loan, Rock Fifth Avenue granted to the Senior Agent for the benefit of the Senior Lenders a mortgage on the Fifth Avenue Property in the amount of $132,332,095, which was recorded in the Office of the City Register of the City of New York, and a security interest in all of its personal property. All of the equity interests in RUSH, Rock Investments and Rock Madison Avenue were also pledged to the Senior Agent for the benefit of the Senior Lenders in connection with the Senior Fifth Avenue Loan.

22. Pursuant to the terms of the Subordinated Facilities Agreement, the Subordinated Lenders also provided a loan to Rock Fifth Avenue, as borrower, in the original aggregate principal amount of not less than $13,332,887 in February 2008, the proceeds of which were used to finance a portion of the purchase price for the Fifth Avenue Property (the "<u>Subordinated Fifth Avenue Loan</u>"). RUSH, Rock Investments and Rock Fifth Avenue guaranteed certain obligations of RJV and certain of its subsidiaries under the Subordinated Facilities Agreement. As collateral security for the Subordinated Fifth Avenue Loan, Rock Fifth Avenue granted to the Subordinated Agent for the benefit of the Subordinated Lenders a mortgage on the Fifth Avenue

Property in the amount of $13,233,049, which was recorded in the Office of the City Register of the City of New York, and a security interest in all of its personal property. All of the equity interests in Rock Holdings, Rock Investments and the Rock Madison Avenue were also pledged to the Subordinated Agent for the benefit of the Subordinated Lenders in connection with the Subordinated Fifth Avenue Loan.

23.     The Bank also provided additional loans to RJV in an aggregate amount of not less than $10,500,000 represented by certain Loan Notes issued by RJV (the "Fifth Avenue Loan Note Financing"). The proceeds of the Fifth Avenue Loan Note Financing were used by Rock Fifth Avenue to finance a portion of the purchase price for the Fifth Avenue Property. As collateral security for the Fifth Avenue Loan Note Financing, Rock Fifth Avenue granted to the Bank a mortgage on the Fifth Avenue Property in the amount of $10,500,000, which was recorded in the Office of the City Register of the City of New York, and a security interest in all of its personal property. All of the equity interests in Rock Holdings, Rock Investments and Rock Madison Avenue were also pledged to the Bank in connection with the Fifth Avenue Loan Note Financing.

### (c) Intercreditor Deed

24.     The terms of an Intercreditor Deed, dated December 11, 2006, as amended (the "Intercreditor Deed"), among the Bank, in its various senior and subordinated agent and lending capacities, the Debtors and certain other parties provide, among other things, that the ranking and priority of the indebtedness arising under the Senior Facilities Agreement, the Subordinated Facilities Agreement and the Fifth Avenue Loan Note Financing is as follows: first, indebtedness arising under the Senior Facilities Agreement (the "Senior Debt"); second, indebtedness arising under the Subordinated Facilities Agreement (the "Subordinated Debt"); and third, indebtedness

arising under the Fifth Avenue Loan Note Financing (the "Loan Note Debt"). The Intercreditor Deed also provides that (i) liens and security interests in collateral securing the Senior Debt are senior in priority to liens and security interests securing the Subordinated Debt and (ii) liens and security interests in collateral securing the Subordinated Debt are senior in priority to liens and security interests securing the Loan Note Debt.

### (ii) Other Secured or Priority Claims

25.     To the best of my knowledge, the Debtors have, in the aggregate, a *de minimus* amount in miscellaneous secured or priority Claims, consisting of approximately $27,000 in unpaid sales taxes to New York State.

### (iii) General Unsecured Claims/Litigation Claims

26.     I have been advised that, as of the Petition Date, the Debtors expect to have a minimal amount of outstanding pre-petition unsecured debt (apart from disputed litigation claims by Scott Pudalov and Alan Wildes), other than the substantial amounts owed to the Bank in respect of its unsecured deficiency claim, the Subordinated Debt and the Loan Note Debt, totaling approximately $381,399. Essentially all other potential unsecured claims arise from the operations of the Properties and are to be paid in the normal course under the cash collateral budget, or via assumption of contracts and leases, although it is possible some small amount of additional claims, including mechanics' lien claims, could be allowed.

27.     As described in more detail in Part II below, the Debtors will file a motion to reject an alleged letter agreement, dated October 16, 2008, between Rock Madison Avenue and Scott Pudalov, an individual formerly employed by RUSPM LLC, pursuant to which Paul Kemsley, purportedly acting on behalf of Rock Madison Avenue, granted Scott Pudalov a right of first refusal to purchase the Madison Avenue Property (the "ROFR Agreement"). This highly burdensome encumbrance, which would have seriously impaired the Debtors' ability to obtain a

fair sale price for Madison Avenue will be terminated by rejection in the bankruptcy process. All bidders on the Madison Avenue Property were made aware of the Debtors' intention to move to reject the ROFR Agreement. Pursuant to the asset purchase agreement entered into with the Madison Avenue Purchaser dated August 26, 2010 it is a condition to the obligation of the Madison Avenue Purchaser to close on the purchase of the Madison Avenue Property that the Bankruptcy Court have entered an order approving the rejection of the ROFR Contract, which order shall not be stayed or reversed. Rejection of the ROFR Agreement may give rise to an unsecured damage claim by Scott Pudalov, which will, to the extent valid, be categorized as a general unsecured claim.

28. There is pending litigation against RUSH, Rock Investments and other entities, including the Administrators and HBOS Plc, an affiliate of the Bank, brought by Alan Wildes and Scott Pudalov. In their complaint filed on June 29, 2010, Pudalov and Wildes allege that HBOS Plc and the Administrators conspired to deprive them of alleged profits interests in the Properties and alleged equity interests in RUSPM LLC. The plaintiffs also allege that HBOS Plc, and the Administrators conspired to depress the value of the Properties, and that the Administrators wrongfully asserted control and dominion over RUSPM LLC's electronic files. The plaintiffs further allege that RUSH breached fiduciary duties allegedly owed to them, and that Rock Investments breached one or more contracts with them. The Debtors believe that the plaintiffs' claims are entirely without merit and the litigation will be stayed as it relates to any of the Debtors upon commencement of the Chapter 11 Cases. Any claims that might be asserted against the Debtors by Scott Pudalov or Alan Wildes arising from the ROFR Agreement, or other claims they have raised in litigation, if determined by this Court to have any validity, would be treated as general unsecured claims which will not receive a distribution under the Plan.

29.     In addition, as of the Petition Date, there were two statutory liens filed against the Madison Avenue Property by (i) Avanti Systems USA Inc., in the amount of $91,795.88 (*lis pendens* filed) and (ii) Primeco Construction Incorporated, in the amount of $45,657.27, and one statutory lien filed against the Fifth Avenue Property by City Lumber Inc., in the amount of $20,791.66 (collectively, the "Mechanics' Liens").   The Debtors believe that the Mechanics' Liens are, for a number of reasons, invalid or otherwise unenforceable and that the Debtors have certain causes of action against the holders of the Mechanics' Liens.  As a result, the Debtors' intend to treat any claims purportedly arising under a Mechanics' Lien as disputed claims.  To the extent any Mechanics' Liens are found to be valid and are allowed, because the value of the Senior Lender's prior perfected liens against the Properties exceeds the value of the Properties, the Mechanics' Liens will be treated as general unsecured claims pursuant to section 506(a)(1) of the Bankruptcy Code.

**(iv)     Intercompany Claims**

30.     There are intercompany claims totaling approximately $2,266,684 owed by Rock Fifth Avenue to Rock Madison Avenue and Rock US Investments to Rock Madison Avenue, arising from the advancement of funds to pay ordinary course operating expenses of Rock Fifth Avenue, certain costs associated with the preparation of the bankruptcy cases and other expenses, which were needed as a result of cash flow deficiencies.   The advancement of these intercompany amounts was consented to by the Bank which maintains a lien on the bank accounts of Rock Fifth Avenue and Rock Madison Avenue.   To the extent there are further deficiencies prior to the effective date of the Plan, the Debtors' anticipate that the cash collateral budget and any orders entered by the Bankruptcy Court in respect of cash collateral will permit additional intercompany funding.

### (v)    Interests

31.    With respect to RJV, Uberior Ventures Limited, an affiliate of the Bank, owns 40% of the interests, PK One Limited, a company wholly-owned by Paul Kemsley, holds 50.1% of the interests, and Kenwood International Inc. and Charter Trust Co (Guernsey) Limited hold the remaining 9.9% of interests.  RJV is the sole member of Rock Madison Avenue and the sole stockholder of RUSH.  RUSH is believed to be the sole member of Rock Investments, and Rock Investments is the sole member of Rock Fifth Avenue.

### D.    Events Leading to the Chapter 11 Cases

32.    The Properties were purchased in 2007-2008 at the peak of the commercial real estate market bubble in the US.  The ability to retain and increase rents, and the market values attributable to the Properties has been adversely impacted by the downturn in the domestic economy and the on-going crisis in the credit markets.  It appears to have been the intent of the Debtors' prior management, consisting of, among others, Paul Kemsley, Scott Pudalov and Alan Wildes, to perform extensive capital renewal to build-out and improve the appearance and usage of the Properties.  However, when the Administrators and the Officers were appointed and inspected the Properties in the summer of 2009, they found most construction projects half completed at best, widespread tenant discontent with their build-outs and the level of building services, and numerous liens imposed by unpaid subcontractors.  Many floors at the Madison Avenue Property, in particular, were in complete disarray with open ceilings and walls, hanging wires and debris scattered throughout the building.

33.    It further appears that the Debtors' prior management contracted with an entity known as Base NY LLC ("Base"), which entered into a multi-million dollar agreement to perform hallway, bathroom and other construction at the Properties.  In fact, Base failed to pay hundreds of thousand of dollars of subcontractor costs for which it had been paid by the Debtors.

In addition, it was revealed that Scott Pudalov had obtained a secret ownership interest in Base (which was never reflected in the corporate records of the Debtors or RJV) through which he received at least $1 million of funds outside of any known employment or fee arrangements with the Debtors.

34.     Following the commencement of the Administration Proceedings, Peter Spratt, one of the Administrators, assisted by Barry Gilbertson, a PricewaterhouseCoopers partner expert in real estate matters, entered the Properties and communicated with the local management and their staff.  As noted, prior to the commencement of the Administration Proceedings, Scott Pudalov and Alan Wildes were the property managers responsible for oversight of leasing, construction, and general asset management.  They were assisted by Christopher Perry, as finance manager, and George Bibb, on the tenant/leasing side.  Access to funding from the Bank and major decisions regarding the Properties were made through RJV and Paul Kemsley.

35.     The Administrators initially sought the cooperation of Scott Pudalov and Alan Wildes in managing the Properties.  However, following an extensive review of their performance through interviews with other staff, viewing the condition of the Properties, talking with tenants, and experiencing less than full cooperation from them (in particular, they proved uncooperative in providing information germane to the management of the Properties and dilatory in providing access to pertinent books and records), the Administrators determined it was necessary to terminate their services "for cause" on July 9, 2009.

36.     The Administrators interviewed candidates to replace Scott Pudalov and Alan Wildes, and, following the termination of Pudalov and Wildes, ultimately hired Sharon Manewitz, an experienced workout manager and me.  Ms. Manewitz and I have been managing the affairs of the Debtors, in consultation with the Administrators, in their capacity as

Administrators of RJV, the sole equityholder of the Debtors, and the Bank. In addition, Ms. Manewitz and I, in consultation with the Administrators, interviewed asset managers, which ultimately led to the retention of Colliers, to handle the day-to-day operations and management of the Properties. Colliers subsequently hired Christopher Perry and George Bibb to assist with the management of the Properties.[9] As a consequence of the engagement of Colliers, the Debtors terminated all employees, but for the two Officers, who receive no salaries.[10]

37.     The Debtors and the Administrators, with the assistance of Colliers, evaluated the condition of the Properties and determined to press ahead aggressively to enhance the leasing of the premises. As a result, numerous new tenants have been brought into the two buildings in the last nine to ten months at market rates. In addition, the Debtors and Colliers have acted to resolve disputes with tenants over rent and tenant improvements, and have commenced litigation where necessary to remove tenants in default under their leases. They have also moved forward with key capital improvements, including elevator renovations in both Properties, corridor repair and other necessary work to comply with New York City building regulations. The Debtors and Colliers projected that substantial infusions of capital above the net rental income from the Properties would be required to fund all operating costs, necessary capital expenditures, and improvements needed to induce higher-paying tenants to occupy the premises.

38.     At the request of the Administrators, the Debtors commissioned Cushman & Wakefield to perform appraisals of the Properties in the August 2009 (the "2009 Appraisals"). The 2009 Appraisals produced a range of values for the Properties of approximately $120 million

---

[9] Kathleen Gardner, the Debtors' office manager, was retained by Colliers as an administrative assistant. She has since resigned to take a position elsewhere.

[10] It should be noted that while Sharon Manewitz and I, as officers of the Debtors, do not received salaries, we, as directors of the Debtors, each receive directors' fees and expense reimbursement.

to $140 million in the aggregate, all substantially diminished from the acquisition prices and far below the outstanding amount of debt owed to the Bank. However, due to improving conditions in the commercial real estate markets in New York City, improvements to the Properties achieved over the last year and the apparent desirability of the Properties to the right owner(s) as realized from the aggressive marketing and sale process, the achievable values on sale based on the bids received on the Properties are significantly higher than such appraisals.

39.     The Debtors, in consultation with the Administrators have determined that (i) given potential confusion to prospective purchasers over the free transferability of the Properties as a result of the pending Administration Proceedings and the insolvency of the Debtors, (ii) in order to ensure the availability of funding for the operations and capital improvements to the Properties in the interim through the use of the Bank's cash collateral, (iii) in order to address the encumbrances on sale created by the ROFR Agreement and the ROFO (defined and described in Part II below), and (iv) otherwise ensure potential purchasers of a transparent sale process which will ensure the transfer of free and clear title to the Properties, exempt from stamp taxes, the use of the pre-packaged Chapter 11 plan and sale process offers the best vehicle for maximizing the realizable values of the Properties.

40.     The Debtors and the Administrators have discussed this process at length with the Bank, and the Bank has agreed to support the Debtors' pre-packaged Chapter 11 plan and sale process, on the terms and conditions set forth in the Plan. Indeed, the Debtors have filed the Plan and disclosure statement (the "Disclosure Statement"). The Plan, which was pre-solicited, has been accepted unanimously by the sole impaired class of claims entitled to vote on the Plan.

## PART II

41.     Concurrently with the filing of this Chapter 11 Case, the Debtors have filed (or as soon as practicable thereafter the Debtors will file) the First Day Motions and a number of

proposed orders, pursuant to which the Debtors seek relief they believe is critical to enable them to operate with minimum disruption to their businesses in the ordinary course following the filing of the chapter 11 petitions. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the approval of the Debtors' First Day Motions is critical and necessary to the success of the Debtors' Chapter 11 Cases and disposition of the Debtors' assets pursuant to the Plan. This section sets forth, in summary fashion, the factual background and support for each of the First Day Motions.[11]

## A. Motion for Order Directing Joint Administration of Chapter 11 Cases

42.     Pursuant Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Bankruptcy Rules for the District of Delaware, the Debtors seek an order directing the joint administration of the Chapter 11 Cases for procedural purposes only. I am advised that the Debtors are "affiliated" entities under the Bankruptcy Code.

43.     Joint administration of the Chapter 11 Cases will provide significant administrative convenience for all parties-in-interest. Many of the motions, hearings and orders that will arise in the Chapter 11 Cases will jointly affect the Debtors. By jointly administering the Chapter 11 Cases, I believe the Debtors will be able to reduce their fees and costs by avoiding duplicative filings and objections. In addition, I believe the ability of parties-in-interest to monitor the Chapter 11 Cases will be facilitated by having all pleadings grouped together on one docket. The joint administration of the Chapter 11 Cases will neither give rise to any conflicts of interest among Debtors nor adversely affect the Debtors' creditors.

---

[11]   The summary that follows is qualified in its entirety by reference to the each of the specific First Day Motions. To the extent of any inconsistency between this Declaration and the First Day Motions, the First Day Motions govern. Further, capitalized terms used but not defined in this section will have the meanings ascribed to them in such respective First Day Motion.

44.     In sum, I believe the joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their creditors, and all parties-in-interest, and the relief requested should be granted in all respects.

**B.     Motion Regarding Cash Management System**

45.     The Debtors have filed a motion (the "Cash Management Motion") for an order (i) authorizing on an interim and final basis the Debtors' continued use of their existing cash management system, maintenance of their existing bank accounts and continued use of their existing business forms, (ii) authorizing on an interim and final basis the Debtors to utilize their existing bank deposit accounts without the need for the bond or other collateral otherwise required by section 345(b) of the Bankruptcy Code, (iii) scheduling a final hearing to consider authorizing and approving the relief requested herein on a final basis (the "Final Hearing"), and (iv) approving notice procedures in connection with the Final Hearing.

46.     Briefly, prior to the commencement of the Chapter 11 Cases, the Debtors entered into two Property Management and Leasing Agreements with FirstService Williams LLC (n/k/a Colliers) and Williams U.S.A. Realty Services LLC ("Williams U.S.A. Realty", and together with Colliers, the "Property Manager"); each of the agreements are dated as of August 31, 2009 (as amended by those certain Amendments to Property Management and Leasing Agreement, dated as of June 10, 2010, the "Property Management Agreements") and they provide for day to day management by the Property Manager of the Properties. The services performed by the Property Manager include collection of rents and expenditure of cash to operate the Debtors' businesses and maintain the Properties. The Debtors also entered into two Cash Management Agreements with the Bank, as lender, and Williams U.S.A. Realty, as Manager, each dated September 1, 2009. The Property Management Agreements and the Cash Management

Agreements govern the cash management system employed by the Debtors (the "Cash Management System").

47.     The Cash Management System consists of two money market accounts, two operating accounts and two security deposit accounts at Capital One N.A. ("Capital One"), which were established pursuant to the Cash Management Agreements, and two operating accounts and two money market accounts at Citibank N.A. ("Citibank") (collectively, the "Debtors' Bank Accounts").  All of the Capital One Bank Accounts are maintained by the Property Manager for the benefit of the Debtors.

48.     Under the Cash Management Agreements, all rents and other income and proceeds from each of the Properties are deposited into the money market accounts at Capital One and recorded in the books and records of the relevant Debtor.  Funds are moved from the Capital One money market accounts into the Capital One operating accounts in order to pay for all of the Debtors' approved operating expenses.  Disbursements from the Bank Accounts are typically made by check or ACH transfers and are recorded in the books and records of the relevant Debtor.  All funds remaining in the Capital One money market accounts on the last business day of each calendar month, if any, are transferred into the Citibank money market accounts, which are essentially holding/savings accounts for the Debtors' excess cash.

49.     The Bank has a perfected security interest in each of the Capital One money market and operating accounts pursuant to certain deposit account control agreements.  The Citibank money market accounts are also subject to deposit account control agreements in favor of the Bank.

50.     All security deposits under the Debtors' leases are deposited into and released from the relevant Debtor's Capital One security deposit account in accordance with the terms of the applicable leases and the relevant Cash Management Agreement.

51.     The Cash Management System constitutes an ordinary course, essential business practice that provides significant benefits to the Debtors' estates, including maintaining the stability of the Debtors' business.  Any disruption to the Cash Management System could have a severe and adverse impact upon the Debtors' operations.  I believe that the relief requested in the Cash Management Motion will facilitate the efficient operation of the Debtors by not requiring them to incur the burden of making technical adjustments to their existing cash management system and bank accounts and such relief should therefore be granted.

### C.     Motion Regarding Utilities

52.     The Debtors will file a motion seeking entry of an interim order on the Petition Date prohibiting utility providers from altering, refusing, or discontinuing services, providing for adequate assurance of future performance for utility providers and establishing procedures for utility providers to seek additional adequate assurance (the "Utilities Motion").

53.     In the normal conduct of their business operations, the Debtors receive service for their Properties from approximately 12 utility companies and other providers (collectively, the "Utility Companies") for the provision of gas, fuel, water, sewer, waste and refuse removal, electricity, internet and telephone and other similar utility services (collectively, "Utility Services").  The Debtors believe that uninterrupted Utility Services are essential to preserve the integrity of the Properties during the pendency of the Chapter 11 Cases, and to prevent damage to the buildings.

54.     The Debtors anticipate that they will have sufficient availability of funds with which to timely pay all post-petition charges for Utility Services from cash on hand and cash

generated during the Chapter 11 Cases from the Properties and the expected sale thereof or other disposition of their assets as part of their Chapter 11 plan. All such cash is cash collateral of the Debtors' pre-petition lender. Payments for Utility Services to the Utility Companies have been included in the Debtors' proposed budget, filed contemporaneously herewith as an exhibit to the Debtors' Cash Collateral Motion (described below) and the Debtors fully anticipate all such payments being made on time and in full, as they were made prior to the Petition Date by Debtors.

55.     As an additional measure, within twenty (20) days of the Petition Date, the Debtors, utilizing cash collateral, propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment for Utility Services, or $77,965, into a segregated account maintained by the Bank (the "Utility Deposit Account") to provide adequate assurance of payment for future services to the Utility Companies.

56.     In light of the severe consequences to the Debtors of any interruption in utility services, but recognizing the right of the Utility Companies to evaluate the proposed adequate assurance on a case-by-case basis, the Debtors are proposing procedures that will enable them to work with the Utility Companies to resolve adequate assurance issues. If the Debtors and a Utility Company cannot consensually resolve such issues, the Debtors will ask the Court to determine whether an additional adequate assurance payment is necessary and, if so, how much it should be before the Utility Company may cease performance for failure of adequate assurance. The procedures the Debtors propose to effectuate this result are identified in the Utilities Motion.

57.     I submit that by ensuring uninterrupted Utility Services, the relief requested by the Debtors serves the best interest of the Debtors, their estates and all parties-in-interest. Moreover, I believe that the proposed procedures are the best (i.e., non-disruptive and orderly) way to

address the concerns of the Utility Companies. As such, I believe the relief requested with respect to the Utility Companies should be granted.

### D. Motion for Authority to Use Cash Collateral

58.     The Debtors will file a motion seeking approval of an interim order on the Petition Date approving the consensual use of Cash Collateral[12] of the Bank pursuant to an approved budget for their operations during the pendency of the Chapter 11 Cases (the "Cash Collateral Motion").

59.     Before the Petition Date, the Debtors and the Pre-Petition Lien Holders (as defined in the Cash Collateral Motion) reached a consensual agreement on the use of Cash Collateral pursuant to the terms and conditions set forth in the proposed Interim Order that is attached to the Cash Collateral Motion as Exhibit A. Accordingly, the Pre-Petition Lien Holders have consented to the Debtors' use of Cash Collateral, subject to the protections, terms and conditions provided for in the Interim Order and to findings to be set forth therein that such consent was given in good faith and that the Pre-Petition Agents and the Pre-Petition Lenders (each as defined in the Cash Collateral Motion) are entitled to the benefits provided by section 364(e) of the Bankruptcy Code.

60.     The Debtors intend to use the Cash Collateral to, among other things, (a) continue operating while in Chapter 11, including paying utilities, property management costs and other overhead; and (b) pay the costs and expenses of administering the Cases including, without limitation funding the professional and other fees associated with the anticipated sales, and

---

[12] The term "Cash Collateral" as used herein and in the Cash Collateral Motion is deemed to include, without limitation, (a) all "cash collateral" as defined under section 363 of the Bankruptcy Code, and (b) all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Debtors in which the Pre-Petition Lien Holders assert security interests, liens or mortgages, regardless of (i) whether such security interests, liens, or mortgages existed as of the Petition Date or arose thereafter pursuant to the Interim Order, and (ii) whether the property converted to cash existed as of the Petition Date or arose thereafter.

otherwise winding down and closing the Debtors' estates. Without the use of the Cash Collateral, the Debtors would be unable to confirm the Plan, consummate the sales and bring about a successful conclusion to the Cases. As such, I submit that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors, their creditors, and all parties-in-interest, and should be granted in all respects.

### E. Motion to Reject the ROFR Agreement

61. The Debtors will seek entry of an order pursuant to section 365(a) of the Bankruptcy Code authorizing the Debtors to reject the Alleged Contract, which, as mentioned above, purports to grant Pudalov a right of first refusal to purchase the Madison Avenue Property on the grounds that the Alleged Contract is an impediment to the successful marketing and sale of the Madison Avenue Property and is of no benefit to the Debtors' estates.

62. Prior to his termination for cause, Pudalov was one of the managers of the Madison Avenue Property. However, upon taking over control of the Properties, the Administrators found a situation of terrible disarray. Specifically, in addition to objectionable physical condition of the building, there were substantial vacancies in the buildings; many tenants were in arrears on their rents; many other tenants were leaving or planning to leave the buildings, citing Scott Pudalov's and Alan Wildes's poor management of the Properties. Further, the investigation conducted by the Administrators produced information indicating that throughout the period of Pudalov's management of the Properties, millions of dollars of the Bank's loan proceeds were filtered out to a Paul Kemsley associate who acted as general contractor for building improvements to the Properties, and who had a secret side-deal (never disclosed to, or approved by, the board of RJV or the Bank) to funnel a portion of that money – at least $1 million – to Pudalov. The poor performance of services by this general contractor, whom Pudalov was responsible for supervising, resulted in angry tenants withholding rent, and

numerous liens being imposed on the Madison Avenue Property by subcontractors whom the general contractor had neglected to pay for their services, despite being reimbursed for these costs by the Debtors.

63.     In addition, Pudalov had utterly failed to undertake to comply with New York City Local Law 11 requirements for ensuring the stability and safety of the façade at the Fifth Avenue Property, which work is now being undertaken under the supervision of the Administrators and the US Directors.  Further, over a hundred thousand dollars were spent by the Debtors on travel and entertainment for Pudalov, Wildes and Kemsley.  It is not clear that these expenses were wholly or appropriately incurred on behalf of the Debtors.

64.     Following his termination "for cause" approximately a year ago, Pudalov has not provided any services to the Debtors or the Properties.  Accordingly, there is no benefit (to the extent any benefit ever existed) to Rock Madison Avenue or the other Debtors, or to their estates or creditors, to continue the Alleged Contract.

65.     Moreover, the Alleged Contract created an encumbrance to the marketing  efforts of the Debtors and their real estate broker, Studley, of the Madison Avenue Property and still creates an encumbrance to the sale of such property.  In order to lessen the Alleged Contract's potential "chilling" effect on bidding, the Debtors, through Studley, advised potential buyers of the Madison Avenue Property that they intended to reject the Alleged Contract under section 365(a) of the Bankruptcy Code and sell the Madison Avenue Property "free and clear" of that alleged right.  The purchase agreement for the Madison Avenue Property that was entered into following the marketing process, conditions the closing on the rejection of the Alleged Contract.

66.     Elimination of the overhang caused by the Alleged Contract will maximize the value of the Madison Avenue Property for the benefit of the Debtors' creditors, including the

Bank (which advanced the funds to acquire the Properties and now finds itself deeply under-secured), as well as other administrative and priority creditors. Thus, I believe that it is in the best interest of the Debtors for this Court to enter an order authorizing the Debtors to reject the Alleged Contract.

### F.    Motion to Assume the Property Management Agreements

67.    By motion (the "Property Management Assumption Motion"), the Debtors will seek entry of an order pursuant to section 365(a) of the Bankruptcy Court authorizing the Debtors to the two Property Management Agreements.

68.    As mentioned above, each of Rock Fifth Avenue and Rock Madison Avenue is party to a Property Management Agreement.[13]    By their terms, the Property Management Agreements automatically renew for subsequent one year periods unless a written termination notice is provided by either party to the other no earlier than 120 days, and no later than 30 days, before the applicable expiration date. The Property Management Agreements would have terminated on August 31, 2010 if any termination notices were provided, however, no termination notices were delivered by any of the parties in connection with either Property Management Agreement.

69.    Pursuant to the Property Management Agreements, the Property Manager, for and on behalf of Rock Fifth Avenue and Rock Madison Avenue, respectively, manages all essential aspects of the Properties, including, but not limited to, negotiating and entering into contracts and leases, maintaining business relationships with the tenants, reviewing leases, requests, demands, collecting all rent and other charges from tenants, and terminating leases upon consent of Rock Fifth Avenue and Rock Madison Avenue, respectively (collectively, the "Leasing and

---

[13]

Management Functions"). The Leasing and Management Functions are essential to the proper utilization of the Properties and to maintaining and maximizing the value of the Properties during the Chapter 11 Cases. The Property Manager is uniquely qualified, after having been engaged by Rock Fifth Avenue and Rock Madison Avenue to provide the Leasing and Management Functions for nearly a year prior to the commencement of the Chapter 11 Cases, to continue operating and managing the Properties on behalf of the Debtors.

70. In addition, pursuant to the June 10, 2010, amendments to the Property Management Agreements, in the event either Property is sold or otherwise transferred to a third party for consideration, Rock Fifth Avenue and/or Rock Madison Avenue, as the case may be, is required to pay to the Property Manager at the closing of such sale, a commission equal to 0.125% of the gross purchase price and consideration tendered for the property sold or transferred; provided, that if the purchaser was identified by the Property Manger in the schedule to each such amendment, the commission shall be increased by 0.25%. These amendments were intended not only to incentivize the Property Manager to continue to provide top-quality services under the Property Management Agreements during the sale process, but also to encourage the Property Manager to assist Studley, the Debtors' real estate broker, with its marketing efforts for the Properties, including, but not limited to, helping to produce a purchaser for the Properties, providing requested diligence information and reports to prospective purchasers regarding the Properties, accommodating Studley with scheduling visits to the Property by prospective purchasers, and assisting with closings of the Properties (collectively, the "Marketing and Sale Functions", and, together with the Leasing and Management Functions, the "Property Manager Functions").

71.     In light of the importance of the continuation of the Property Manager Functions during the marketing and sale process of the Properties and during the Chapter 11 Cases, all of which will help serve to preserve and maximize the value of the Properties, I submit that the Court should approve the relief requested in the Property Management Assumption Motion.

**G.     Motion for a Combined Hearing on the Adequacy of the Disclosure Statement, Solicitation Procedures and Plan Confirmation**

72.     The Debtors intend to file a motion (the "Combined Hearing Motion") seeking entry of an order on the Petition Date setting the date for a combined hearing to consider (1) approving this Disclosure Statement as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code; (2) approving the solicitation of votes on the Plan as having been in compliance with section 1126(b) of the Bankruptcy Code; and (3) confirming the Plan. I believe this relief is essential to expedite the Chapter 11 Cases and efficiently move the Debtors out of bankruptcy.

73.     Prior to the Petition Date, the Debtors solicited approval of the Plan as authorized by section 1126(b) of the Bankruptcy Code. The Debtors prepared the Disclosure Statement describing, among other things, the proposed Plan and its effects on the holders of claims against and interests in the Debtors.

74.     The Debtors caused a copy of the Disclosure Statement, the Plan, and the ballot to be delivered to each creditor entitled to vote on the Plan (the "Solicitation Package").[14] The Debtors established 5:00 p.m. prevailing Eastern Time on September 15, 2010 (prevailing Eastern Time), as the deadline for the receipt of votes to accept or reject the Plan.

---

[14] Under the Plan, only holders of Senior Lender Claims (Class 1) are impaired, as that term is used by section 1124 of the Bankruptcy Code, and entitled to vote on the Plan. Creditors in Classes 2 and 3 are unimpaired under the Plan and are, therefore, deemed to accept the Plan. See 11 U.S.C. § 1126(f). The Plan provides no distributions to holders of claims in Classes 4, 5, 6 and 7, nor to holders of interests in Class 8. Therefore, such holders will be deemed to reject the Plan. See 11 U.S.C. § 1126(g). As a result, the Debtors solicited acceptances and rejections of the Plan only from holders of Class 1 Senior Lender Claims.

75.     The Debtors believe that the expedited solicitation period was appropriate under the circumstances of these Chapter 11 Cases and the holders of Class 1 Senior Lender Claims (as defined in the Plan) consented to the same. At the time the solicitation was commenced by the Debtors, the Plan had been developed through lengthy, substantial and productive negotiations between the Debtors and the holders of Class 1 Senior Lender Claims. As a result, the holders of Class 1 Senior Lender Claims had significant familiarity with, and the opportunity to provide input on, the Plan's material terms prior to receipt of the Solicitation Package. A longer solicitation period would have unnecessarily delayed the resolution of claims against the Debtors, placed undue strain on the Debtors' liquidity, and prolonged uncertainty regarding the sale of the Properties, without providing any benefit to the Debtors' estates or creditors.

76.     The Debtors' solicitation was a success; holders of Class 1 Senior Lender Claims unanimously accepted the Plan.

77.     As such, the Debtors will seek to have the Court schedule the combined hearing approximately sixty (60) days from the Petition Date. I understand that this proposed hearing date is in compliance with the Bankruptcy Code and Bankruptcy Rules. In addition, as indicated above, the holders of Class 1 Claims are the only impaired creditors entitled to vote under the Plan and the votes received therefrom demonstrate unanimous acceptance of the Plan.

78.     Since most sensitive and complex task required to implement a successful reorganization—the negotiation of consensual agreements with critical creditor constituencies—has already been accomplished in advance of the Petition Date, and the Plan was accepted by the creditors entitled to vote, I respectfully submit that the circumstances weigh in favor of scheduling the combined hearing as provided in the Combined Hearing Motion.

### H. Motion to Assume Executory Contract with The New York City Landmarks Preservation Commission

79.     The Debtors will file a motion on the Petition Date seeking entry of an order pursuant to section 365(a) of the Bankruptcy Code authorizing the assumption of a letter agreement between Rock Madison Avenue and the New York City Landmarks Preservation Commission (the "LPC") dated September 14, 2010 (the "Standstill Agreement").

80.     Prior to the Petition Date, the Debtors became aware that the LPC had begun the process of designating the Madison Avenue Property as a landmark site.  In an effort to ensure that the landmarking process did not interfere with the marketing and sale process of the Madison Avenue Property by (i) discouraging potential bidders from submitting bids, (ii) depressing the value of bids received, (iii) increasing potential break-up fee and expense reimbursement demands, (iv) potentially generating litigation between Rock Madison Avenue and the LPC over the impact of the automatic stay on the landmarking process, which might delay the confirmation of the Debtors' Plan and successful transfer of the Madison Avenue Property, and (v) diverting the attention of the Debtors' management and advisors and increasing their administrative burdens during the critical marketing and sale process, the Debtors entered into negotiations with the LPC with respect to a standstill of the landmarking designation process.

81.     Following lengthy, arms'-length negotiations with the LPC, Rock Madison Avenue and the LPC entered into the Standstill Agreement pursuant to which, among other terms and conditions set forth therein, the LPC agreed not to schedule a hearing for designation of the Madison Avenue Property as a landmark or schedule a hearing for designation of any portion of the ground floor lobby of the Madison Avenue Property as an interior landmark, prior to the earlier of (a) one month following the date of the conveyance of the Madison Avenue Property

pursuant to an order entered by this Court or pursuant to any other method of title transfer, and (b) nine months from the date of the Standstill Agreement.

82.     During this negotiation process, and in a good faith attempt to, among other things, limit uncertainty in the marketing and sale process of the Madison Avenue Property, the Debtors and Studley conveyed to the market that they were working to reach an agreement with the LPC to defer the landmark designation process until after the sale of the Madison Avenue Property was consummated in order to give the new owner the opportunity to deal directly with the LPC concerning such process.  The message conveyed and the ultimate achievement of the settlement helped to induce potential purchasers to deliver their highest and best bids for the Madison Avenue Property.  As a result of such process, the Debtors have selected Rigby 183 LLC to be the Madison Avenue Purchaser and have entered into an asset purchase agreement with the Madison Avenue Purchaser (the "APA"), which is attached as an exhibit to the Plan.

83.     While it is not a condition in the APA to the obligation of the Madison Avenue Purchaser to close on the purchase of the Madison Avenue Property that this Court have entered an order approving the Standstill Agreement, the Debtors have given the Madison Avenue Purchaser reasonable assurances that it will seek the Court's approval of the Standstill Agreement.  In addition, pursuant to the terms of the Standstill Agreement, the LPC required that if the Standstill Agreement was entered into prior to the Petition Date, Rock Madison Avenue would seek to assume the Standstill Agreement as an executory contract under section 365(a) of the Bankruptcy Code.

84.     Accordingly, because of the importance of the Standstill Agreement to the sale of the Madison Avenue Property and to the Madison Avenue Purchaser, I believe that assumption of

the Standstill Agreement is in the best interest of the Debtors, their creditors and all parties-in-interest.

### I.     Approval of ROFO Waiver

85.     The Debtors will file a motion (the "ROFO 9019 Motion") on the Petition Date seeking entry of an order pursuant to Bankruptcy Rule 9019 approving 100-104 Fifth Avenue: Waiver of Right of First Refusal between Rock Fifth Avenue and OFA dated August 12, 2010 (the "Waiver").

86.     As described in Part I above, the Fifth Avenue Property consists of two condominium "units": (i) the "retail unit", which is located on the ground floor and owned by OFA, and (ii) the "office unit", which occupies floors 2-19 and is owned by Rock Fifth Avenue. The respective rights of OFA and Rock Fifth Avenue in and to the Fifth Avenue Property are governed by that certain Declaration Establishing a Plan for Condominium Ownership of 100-104 Fifth Avenue, New York, New York, dated August 13, 2007 (the "Condo Declaration").

87.     Pursuant to the Condo Declaration, OFA and Rock Fifth Avenue each have a right of first offer to purchase from the other its respective ownership in the Fifth Avenue Property (the "ROFO"). The ROFO is triggered when the unit owner interested in selling its interest in the Fifth Avenue Property (the "Electing Party") delivers notice of its intent to sell to a third party (a "ROFO Notice") to the other unit owner (the "Non-Electing Party"), which notice shall include the sale price and other material terms of the proposed sale. The Non-Electing Party then has 45 days from the date of receipt of the ROFO Notice to advise whether it will purchase the Fifth Avenue Property at the price set forth in the ROFO Notice, and an additional 30 days thereafter to close on the purchase. If the Non-Electing Party declines to purchase the Electing Party's interest in the Fifth Avenue Property at the price set forth in the ROFO Notice, the Electing Party may then sell its interest to any third party so long as the sale price is not less than 97% of the

price set forth in the ROFO Notice. Re-noticing and other provisions apply to the extent such sale does not close within a certain period of time or if the price at which the Electing Party's interest is to be sold is below 97% of the price set forth in the ROFO Notice.

88. Prior to the Petition Date, in an effort to ensure that the ROFO would not interfere with the marketing and sale process of the Fifth Avenue Property by discouraging potential bidders from participating, depressing bids, increasing break-up fee and expense reimbursement demands, and potentially generating litigation between Rock Fifth Avenue and OFA which might delay the confirmation of the Plan and successful transfer of the Fifth Avenue Property, the Debtors entered into negotiations with OFA with respect to a obtaining a waiver of the ROFO.

89. Following lengthy, arms'-length negotiations with OFA, Rock Fifth Avenue and OFA entered into the Waiver pursuant to which OFA agreed, on a one-time basis only, to waive the ROFO, pursuant to certain terms and conditions set forth in the Waiver.

90. Until Rock Fifth Avenue entered into the Waiver with OFA, the existence of the ROFO clouded and introduced significant uncertainty into the marketing and sale process with respect to the Fifth Avenue Property. However, through achieving the execution of the Waiver, as more fully described below, the Debtors and Studley were able to induce potential purchasers to deliver their highest and best bids for the Fifth Avenue Property. As a result of such process, the Debtors have selected the Fifth Avenue Purchaser and have entered into an asset purchase agreement with the Fifth Avenue Purchaser, which is attached as an exhibit to the Plan. The sale of the Fifth Avenue Property is to be consummated pursuant to and following the confirmation of the Plan, which the Debtors have filed contemporaneously herewith.

91.     Pursuant to the Waiver, the Debtors are required to file the ROFO 9019 Motion within seven (7) days of the Petition Date and are also required to keep the terms and conditions of the Waiver highly confidential.

92.     Pursuant to the APA, it is a condition to the obligation of the Fifth Avenue Purchaser to close on the purchase of the Fifth Avenue Property that the Bankruptcy Court have entered an order approving OFA's waiver of its rights under the ROFO.   Consequently, it is imperative to the success of the sale of the Fifth Avenue Property and the Chapter 11 Cases that the relief requested in the ROFO 9019 Motion be granted.

**J.      Bidding Protections Motion**

93.     Concurrently herewith, the Debtors will file a motion on the Petition Date seeking entry of an order approving certain bid incentives for the Purchasers in connection with the sale of the Properties and other assets and approving certain procedures in connection with the proposed assumption and assignment of certain executory contracts and unexpired leases in connection with the sale of certain of the Debtors' assets (the "Bid Protections Motion").

94.     In the months leading up to the commencement of their Chapter 11 cases, an extensive sales marketing campaign for the Properties, the Debtors held highly competitive arms'-length auctions for the Properties with multiple bidders and multiple bidding rounds, expended considerable time and money in connection with the marketing campaign and the auctions and determined, in the exercise of their sound business judgment, that the Purchasers submitted the highest and best bids for the Properties.  Based on, *inter alia*, the results of the marketing process, the Debtors are seeking to sell the Properties through confirmation of the Plan without conducting a further auction for the sale of the Properties.  As mention above, the Bank, which holds mortgages, liens and security interests against the Properties in the aggregate amount

of not less than $303,000,000,00, and whose claims are significantly undersecured, has accepted the Plan and consents to the sale of the Properties to the Purchasers.

95.     Although the Debtors are seeking to sell the Properties to the Purchasers without a further auction, the Debtors will nonetheless seek approval of certain bid incentives requested by the Purchasers. These bid incentives include (i) approval of a break-up fee equal to one percent (1%) of the purchase price under the Purchase Agreements (payable only in the unlikely event that the Purchase Agreements are terminated for certain limited reasons and a Competing Transaction (defined below) is closed); and (ii) certain no-solicitation and overbid protections with appropriate fiduciary "outs". Details regarding the bid incentives and the other sale-related relief the Debtors seek are set forth in the Bid Protections Motion.

96.     Based on my understanding of the sale process, I believe that the bid incentives were necessary to incentivize bidders to actively participate in the sales process and make their highest and best bids for the Properties, have benefitted the Debtors, their estates and their creditors, and in no way conflict with the Debtors' fiduciary duties to maximize the value of the Properties. Accordingly, I respectfully request that the Court grant the relief requested in the Bid Protections Motion.

### K.     Professional Retention Applications

97.     The Debtors will also file on the Petition Date various applications seeking authority to retain and pay its professionals who will be advising the Debtors during the Chapter 11 Cases, including: (i) Bayard P.A., as bankruptcy counsel, (ii) Hogan Lovells, as special corporate counsel and as litigation counsel, (iii) Jones Day, as special real estate counsel, and ( iv) Studley, as real estate broker.

### (a) Bayard P.A., as bankruptcy counsel,

98.     The Debtors propose to engage Bayard P.A. as counsel for the Debtors in the Chapter 11 Cases.

99.     The Debtors seek to retain Bayard because of the firm's extensive general experience and knowledge in the field of debtor's and creditor's rights and business reorganizations under Chapter 11 of the Bankruptcy Code.  Given the firm's substantial experience representing debtors in complex reorganization cases, Bayard is well-suited for the type of representation required by the Debtors.  I understand that Bayard has extensive experience appearing before the courts in Delaware.  For these reasons, I respectfully request that the Court grant the relief sought on behalf of the Debtors in the application for retention of Bayard as bankruptcy counsel.

### (b) Hogan Lovells, as special corporate counsel and as litigation counsel,

100.    The Debtors propose to engage Hogan Lovells US LLP ("Hogan Lovells") as Special Corporate and Litigation Counsel for the Debtors in the Chapter 11 Cases.

101.    Hogan Lovells has extensive experience representing the Debtor in connection with corporate matters as well as existing litigation and has consistently provided the Debtors with effective and efficient legal services.  The Debtors believe that both the interruption and duplicative costs involved in obtaining substitute counsel at this juncture would be extremely harmful to the Debtors and their estates.  Accordingly, the Debtors determined that Hogan Lovells has the resources and experience necessary to represent them as Special Corporate and Litigation Counsel for the continuing corporate and litigation matters in the Chapter 11 Cases.

102.    For all of these reasons and those set forth in the Hogan Lovells retention application filed concurrently herewith, I respectfully request that this Court grant the relief sought on behalf of the Debtors in the Hogan Lovells retention application.

### (c)     Jones Day, as special real estate counsel

103.    The Debtors will file an application seeking to retain and employ Jones Day as special real estate counsel to Rock Fifth Avenue and Rock Madison Avenue (collectively, the "Real Estate Debtors") during the pendency of the Chapter 11 Cases based on, among other things: (a) Jones Day's international reputation and extensive experience and expertise with respect to real estate law generally and (b) the general knowledge and information that Jones Day obtained regarding the Real Estate Debtors, their businesses, and the Properties and operations, as a result of Jones Day's representation of the Real Estate Debtors prior to the Petition Date.

104.    I believe that the employment of Jones Day as special real estate counsel for the Real Estate Debtors will enable them to avoid the unnecessary expense otherwise attendant to having another law firm familiarize itself with the various real estate issues that may arise during these Chapter 11 Cases.  Further, I believe that Jones Day is well-qualified and uniquely able to provide the specialized legal advice sought by the Real Estate Debtors in an efficient and effective manner in connection with the real estate issues that may arise during these Chapter 11 Cases and thus Jones Day's retention is in the best interest of the Debtors, their estates and their creditors.

### (d)     Studley, as real estate broker

105.    The Debtors will file an application, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, and Rules 2014(a) and 2016 of the Bankruptcy Rules, authorizing the Debtors to retain and employ Studley as real estate broker.  Studley is a major commercial real estate services firm with over 300 professionals in 19 offices nationally and a presence in 10 countries in Europe and North Africa.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: September 15, 2010

Name: Michael L. Brody
Title:  Senior Vice President